NOT DESIGNATED FOR PUBLICATION

No. 118,248

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In The Interests of
O.M., A.M., E.M., and S.M.,
Minor Children.

MEMORANDUM OPINION

Appeal from Franklin District Court; ERIC W. GODDERZ, judge. Opinion filed March 30, 2018.
Affirmed.

*Elizabeth L. Oliver*, of Oliver Law Office, Ltd., of Ottawa, for appellant natural mother.

*Stephen A. Hunting*, county attorney, for appellee.

Before BRUNS, P.J., PIERRON and POWELL, JJ.

PER CURIAM: This appeal arises out of the district court's decision terminating the parental rights of K.J., who is the natural mother of O.M., A.M., E.M., and S.M. The first issue presented on appeal is whether there is appellate jurisdiction in light of the failure of K.J.'s counsel to file a notice of appeal in a timely manner. Because K.J. has a statutory right to effective counsel in order to protect her constitutional rights as a parent, we find that it is appropriate to review the issues presented on the merits. However, we do not find that the district court abused its discretion in denying K.J.'s second motion for a continuance of the termination hearing. Moreover, we find that there is clear and convincing evidence in the record upon which a reasonable fact-finder could conclude that K.J.'s parental rights should be terminated. Finally, even if we had appellate jurisdiction over the issue, we find that the district court did not err in failing to place the

1

children with their maternal grandmother under the circumstances presented. Thus, we affirm.

FACTS

K.J. is the natural mother of O.M., born in 2007; A.M., born in 2008; E.M., born in 2012; and S.M., born in 2006. Each of the children share the same father, who has voluntarily relinquished his parental rights. On April 22, 2016, the State filed separate petitions in district court alleging that O.M., A.M., E.M., and S.M. were each a child in need of care. The petitions alleged that an emergency existed necessitating out of home placement. Specifically, it was asserted that there were "[a]llegations of domestic violence and drug use in the home while the children were present; drugs and paraphernalia found in home; father incarcerated, children sent to stay with grandmother whose home is not appropriate for children and has been substantiated on for physical abuse of a child."

The petition also included a summary of events that occurred on April 5, 2016, in which the Ottawa Police Department responded to a Casey's General Store where they found a woman—not K.J.—with a baby who had been in a fight. Evidently, the woman lived with the children's father. She told officers that the two had been fighting throughout the night. According to the woman, when the children's father had fallen asleep, she grabbed her baby and ran to the Casey's store.

The children's father was also at the Casey's store when the officers arrived. He stated that O.M., A.M., E.M., and S.M were at his house and that he had left them alone. He admitted that he used methamphetamine and indicated that K.J. did as well. He stated that K.J. also had been at the house during the incident. He further stated that during the altercation with the woman, two of his children were sleeping on the couch and the other two were upstairs sleeping.

2

The officers allowed K.J.'s mother to pick up the children from their father's house. In addition, they reported the incident to DCF on April 20, 2016. The same day, a social worker spoke to one of the children. The social worker noticed that the child's teeth were blackened, and the child stated that her teeth hurt very badly.

The social worker also went to the maternal grandmother's house where the children were staying. She stated that the home was cluttered and dirty. The grandmother stated that the children were sleeping in the attic of the house. The social worker observed that the stairs leading to the attic were narrow and steep with no railing. In the attic bedroom there were open bags of cat litter and an open full litter box. Medication bottles were on a coffee table in the room within reach of the children. The beds the children were reported as sleeping in had no sheets on them. The grandmother reported that she was on probation through Johnson County. Living in the home were five adults and the four children. A family preservation worker attempted to get a UA from the grandmother, but she stated she could not urinate even after the social worker waited for an hour while grandmother drank two cups of coffee. The petition stated that the grandmother and her husband "are listed on the Central Registry for physical abuse of a child."

On May 3, 2017, the State filed a motion for finding of unfitness and termination of parental rights to each of the children. The State alleged that the parents were unfit under K.S.A. 2017 Supp. 38-2269(b)(2), (b)(3), (b)(5), (b)(7), (b)(8), (c)(2), and (c)(3). Sometime in the middle of June, K.J. was arrested and confined in the Franklin County jail. The case was originally set for trial on July 12, 2017, but the district court continued it for one week due to communication issues between K.J. and her counsel. The children's father relinquished his parental rights on July 12, 2017.

On July 19, 2017, the district court held a hearing on the motion to terminate K.J.'s parental rights. K.J. appeared with counsel, as did the children's maternal grandmother

3

and a guardian ad litem for the children. At the beginning of the hearing, K.J. asked the district court to postpone the trial for 90 days to allow her more time to work on her case plan goals, on which she claimed to be progressing recently. The district court denied the request and held the trial.

Testifying for the State was Jaclynne Putney, a child protection specialist for the Ottawa Department for Children and Families (DCF). She was the assigned investigator for these children. She testified that there had been eight total reports to DCF on this family for physical neglect, drug concerns, and domestic violence from 2013-2015. K.J. was offered family preservation services three times, and she only accepted the service in 2014. The children were placed in protective custody on September 24, 2015, when K.J. was arrested on drug charges, but the children were released to their father, who accepted family preservation services. The family preservation services did not include K.J.

Putney testified that the current case began in April 2016 after the children witnessed a domestic incident between their father and his live-in girlfriend. After the incident, the children were living in the maternal grandmother's home, and when DCF spoke to the maternal grandmother, they determined that the home was not in a condition in which children should be residing. The maternal grandmother told DCF that K.J. was a drug addict and was not to be around the children. Putney testified that when the children were taken into custody, A.M. complained about her teeth hurting. Her teeth had blackened, and she said she could not remember ever going to the dentist.

Next to testify was Brittany Smith, a licensed professional counselor with KVC Health Systems, Inc. (KVC). She was the case manager for these children from May 2016 to May 2017. Smith testified:

"[K.J.] had case plan tasks for housing, income, RADAC evaluation, recommendations, transportation plan, mental health, parenting, addressing legal matters

4

or keeping us up to date on legal matters, attending case plans outside of the first one were the primary case plan tasks assigned.

"And then she was later assigned a task for learning sign language in order to better communicate with the children and with the Court."

According to Smith's testimony, K.J. never obtained sufficient housing for the children despite KVC paying for her startup fee in order to get utilities. At the time of the hearing, K.J. was residing in the Franklin County Jail. Smith testified that she had no documentation that K.J. had appropriate housing once released. K.J. never provided documentation proving that she had employment. K.J. signed a release so a temp-to-hire agency she worked at could release her work documentation, but KVC never received any proof of employment. Smith testified that she had no documentation or verification that K.J. had or did not have a job at the time of the termination hearing.

K.J. completed a Regional Alcohol & Drug Assessment Center (RADAC) evaluation on November 16, 2016. The recommendation from that assessment was for her to complete level 1 outpatient treatment services. KVC provided K.J. with a phone number for the service, but K.J. had not notified KVC if she had engaged in outpatient treatment. Throughout the case, Smith never received documentation that K.J. engaged in outpatient treatment. KVC worked with K.J. to try to do weekly random UAs. Smith testified that K.J. had 15 clean UAs, 6 positive UAs, and more than 31 missed UAs. The UAs were positive for meth and amphetamines. K.J.'s last positive UA was on May 16, 2017, and that was the last UA she took.

Smith testified that K.J. relied on others for rides, and her transportation was not reliable because she missed approximately one-third to one-fourth of her appointments. K.J. never completed a mental health evaluation. She never attended parenting classes. When asked if K.J. had attended any parenting classes, Smith testified, "Not to my knowledge." According to Smith, K.J. usually kept her updated on her legal status. K.J.

5

was supposed to learn sign language to help her communicate with KVC and with her children. KVC identified some free resources for K.J. and also assisted the children in learning sign language, so they could potentially practice in visits. When asked if K.J. ever followed up on those resources, Smith testified, "Not to my knowledge." K.J. never provided documentation or demonstration of learning sign language.

During the year that the children were in custody, K.J. had 12 in-person visits with them at the KVC offices. She would often have to cancel visits either because she was unable to get to the office to do a UA or because she had a positive UA. When she did have visits, they went fairly well, and she seemed to have a bond with the children. Although K.J. used to keep regular contact with KVC, her last contact with them was May 16, 2017.

Regarding KVC's efforts to help K.J. with her tasks, Smith testified that KVC met K.J. at a gas station to get a UA when she was not able to come to KVC offices, Smith sat with her on two occasions in order to schedule the RADAC evaluation, and KVC provided transportation to visits. Smith reviewed the case plan tasks with K.J. so that she was aware of the tasks. Smith testified regarding how the children were doing in their current placement. She then testified that KVC was recommending termination of parental rights due to K.J.'s lack of completing any of her case plan tasks or showing the ability to complete them in the near future along with the length of time the children had been in care and their need for permanency.

K.J.'s counsel called K.J.'s mother to testify. She testified that if K.J. was released from jail, she could live at her house. She noted that K.J. had a prescription for pain medication, but she did not know if the medication contained opiates. She stated that in the past year K.J. worked for two-and-a-half to three months at Focus, which was a temp agency that placed her at American Eagle. She also worked at Jet for a month and at CFS. According to K.J.'s mother, LMC Truck was holding a job for K.J. Additionally, LMC

6

Truck was where K.J.'s mother worked, so K.J. could ride to work with her. She testified that K.J. did two RADAC assessments and a mental health evaluation. She was diagnosed by Southeast Kansas Mental Health with post-traumatic stress disorder and received treatment from Southeast for two months before she went to jail. She ordered a book about sign language for K.J. She wanted to be considered to adopt the children. She stated that she had looked into her criminal history and found nothing. She also stated that she called DCF in Topeka, and they also had nothing on her record.

After hearing the evidence, the district court determined that "the mother has done nothing. The little she has done has been negated by subsequent activity on her part." The district court found that even though she alleged to have gotten another evaluation and started going to outpatient treatment, she provided no proof to support her allegations. At the conclusion of the hearing, the district court determined that K.J. was unfit by reason of conduct or condition that rendered her unable to care properly for the children and that was unlikely to change in the foreseeable future. The district court determined that it was in the best interests of the children to terminate parental rights. The district court, therefore, terminated K.J.'s parental rights to the children.

At the end of the hearing, the district court stated:

"[K.J.], if you wish to appeal the Court's ruling you may. Ms. Branson can advise you on how to get that accomplished. Other than that, Ms. Branson [K.J.'s attorney], if she does not appeal your obligations in this case will be terminated. You'll need to advise her of that.

"MS. BRANSON: Thirty days to appeal a termination of parental rights?

"THE COURT: I think it's thirty days, yes."

The journal entry terminating K.J.'s parental rights was filed the same day as the hearing—July 19, 2017. On August 23, 2017, K.J. filed a notice of appeal in each case, stating she was appealing the district court's finding her unfit and terminating her parental rights as well as all adverse rulings to this court. On September 13, 2017, the district court filed an order consolidating all four cases.

After K.J. docketed her appeal, our motions panel issued an order to show cause why this appeal should not be dismissed for lack of jurisdiction due to the fact that K.J. filed her notices of appeal 35 days after the district court's journal entry and beyond the 30 day limitation of K.S.A. 2017 Supp. 60-2103(a). After receiving responses from the parties, the motions panel determined that this court should retain the appeal on the present showing. However, the motions panel ordered the parties to brief the jurisdictional issue for the panel assigned to hear the merits of the appeal.

ANALYSIS

*Appellate Jurisdiction*

The State contends that we lack jurisdiction over this appeal because K.J. did not file a timely notice of appeal from the order terminating her parental rights. The existence of jurisdiction is a question of law over which this court has unlimited review. *In re N.A.C.*, 299 Kan. 1100, 1106, 329 P.3d 458 (2014). The right to appeal is only available through statutes—it is not contained in the United States or Kansas Constitutions. Thus, Kansas appellate courts only have jurisdiction to entertain an appeal if the appeal is taken in the manner prescribed by the applicable statutes. See *Wiechman v. Huddleston*, 304 Kan. 80, 86-87, 370 P.3d 1194 (2016).

An interested party shall file a notice of appeal from a district court's termination of parental rights within 30 days. K.S.A. 2017 Supp. 38-2273(a), (c); K.S.A. 2017 Supp.

8

60-2103(a). It is undisputed that K.J. failed to file her notice of appeal within 30 days of the district court's order terminating her parental rights as a result of an error on the part of her appointed counsel. The State maintains that K.J.'s failure to timely file her notice of appeal divests this court of jurisdiction and that this court has the duty to dismiss an appeal when the record shows a lack of jurisdiction. See *Wiechman*, 304 Kan. at 85 ("When the record discloses a lack of jurisdiction, the court must dismiss the appeal.") K.J. argues that she should be allowed to proceed on appeal under the reasoning of *State v. Ortiz*, 230 Kan. 733, 640 P.2d 1255 (1982), due to ineffective assistance of counsel.

Here, the journal entry terminating K.J.'s parental rights was filed by the district court on July 19, 2017. As such, she had 30 days from that date to file a notice of appeal. However, between the time the journal entry was filed and the deadline for the filing of the notice of appeal, the district court allowed K.J.'s trial counsel to withdraw. She was then appointed new counsel on August 7, 2017. At that point, there was still sufficient time to file a timely notice or notices of appeal. However, the newly appointed counsel evidently did not understand that K.J.'s parental rights had already been terminated and candidly admits that she failed to file a notice or notices of appeal in a timely manner.

Specifically, the attorney appointed to represent K.J. in this appeal acknowledges in her response to the order to show cause entered by our motions panel that she did not realize that K.J.'s parental rights had been terminated until after she appeared at a hearing on August 17, 2017. She then visited K.J. in jail on August 22, 2017, and prepared a notice of appeal. The following day, she obtained K.J.'s notarized signature before belatedly filing a notice of appeal on August 23, 2017.

K.J. contends that we should apply the reasoning from *In re T.M.C.*, 26 Kan. App. 2d 297, 988 P.2d 241 (1999), in which a panel of this court determined that the *Ortiz* factors should apply to a determination of whether to retain an untimely Child in Need of Care appeal. In *In re T.M.C.*, the district court terminated a natural mother's parental

9

rights. Although the mother and her court-appointed attorney discussed the merits of an appeal immediately after her parental rights were severed, her attorney told her that an appeal would be groundless and that he did not want to file an appeal for her. Eventually, the mother filed in the district court a request to file an untimely appeal from the order terminating her parental rights. The district court denied the request, concluding that it lacked jurisdiction to grant it.

On appeal, the parties agreed that the mother was not informed by her court-appointed attorney that she had 30 days after the entry of judgment to file her appeal. The court also stated that there was no indication in the record that the district court had informed the mother of the 30-day period. Because a parent's right to counsel in an appeal from a termination of parental rights proceeding is founded on constitutional grounds, the *In re T.M.C.* court concluded that the mother's appeal could not be cut off due to the ineffective assistance of counsel, apparently determining that counsel's failure to inform the mother that she had 30 days after the entry of judgment to file her appeal constituted ineffective assistance of counsel. Thus, the court reversed and remanded with directions to allow the mother to docket her appeal. 26 Kan. App. 2d at 301.

Although the Kansas Supreme Court has not issued an opinion specifically stating whether a parent has any right to file an untimely notice of appeal after termination of parental rights, it has cited favorably to *In re T.M.C.* in an appeal from the denial of an inmate's K.S.A. 60-1507 motion. See *Guillory v. State*, 285 Kan. 223, 227-28, 170 P.3d 403 (2007). In *Guillory*, our Supreme Court considered whether the *Ortiz* exceptions could be applied to save an untimely notice of appeal of a district court's decision summarily denying Guillory's pro se K.S.A. 60-1507 motion. In particular, Guillory argued that the first *Ortiz* factor applied because the district court never informed him that he had a right to appeal the denial of his K.S.A. 60-1507 motion within 30 days of the decision.

In *Guillory*, our Supreme Court noted that this court had applied the *Ortiz* analysis in the case of *In re T.M.C.* because the appellant had a statutory right to appointed counsel throughout the proceeding to advocate the mother's constitutional rights. 285 Kan. at 228. Ultimately, in *Guillory*, it was determined that the *Ortiz* analysis did not allow Guillory to file an untimely appeal in his case. Nevertheless, we find it significant that our Supreme Court did not question the rational of *In re T.M.C.*

The State argues that this court should follow the case of *In re L.B.*, 42 Kan. App. 2d 837, 217 P.3d 1004 (2009), *rev. denied* 289 Kan. 1278 (2010), instead of *In re T.M.C.* In *In re L.B.*, a natural mother filed a notice of appeal within 30 days of the district court's order terminating her parental rights. However, in her notice of appeal, the mother stated that she wished to appeal the termination finding as well as the temporary placement order and child in need of care (CINC) finding. On appeal, a panel of this court determined that it had no jurisdiction to review the district court's orders of temporary custody and CINC findings because the record clearly showed that the mother's notice of appeal was untimely as to those rulings. 42 Kan. App. 2d 843-44.

The panel in the *In re L.B.* case decided that it would not follow the holding of *In re T.M.C.* 42 Kan. App. 2d at 840. Instead, the panel determined that the constitutional right at risk in a termination of parental rights case is different from the constitutional right at risk in a criminal case. The panel held that although an indigent parent is entitled to due process protections under the Fourteenth Amendment to the United States Constitution, the parent's rights were subject to the balancing test established in *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976). After balancing these factors, the *In re L.B.* court concluded that the mother was not entitled to take an untimely appeal of the prior orders of temporary custody or the CINC finding. 42 Kan. App. 2d at 843-44.

In the present case, of course, we are not dealing with the untimely filing of an appeal from temporary orders. Rather, we are dealing with a parent whose constitutional rights have been permanently terminated. Moreover, as K.J.'s court-appointed attorney has candidly admitted, the notice of appeal was not timely filed due to a mistake by her and not by her client. As our Supreme Court has found, when a person is statutorily entitled to counsel, that person must receive effective assistance of counsel so that the appointment is not a useless formality. *Mundy v. State*, 307 Kan. 280, 295, 408 P.3d 965 (2018); *Albright v. State*, 292 Kan. 193, 207, 251 P.3d 52 (2011). We, therefore, conclude that under the circumstances—specifically, the deficient performance of legal counsel in failing to file a timely appeal—K.J.'s appeal should be considered on the merits.

*Motion for Continuance*

The first issue presented by K.J. is whether the district court erred in denying her motion for a continuance at the termination hearing on July 19, 2017. We review a district court's refusal to grant a continuance for abuse of discretion. *In re J.A.H.*, 285 Kan. 375, 384, 172 P.3d 1 (2007). Typically, abuse of discretion occurs if no reasonable person would take the view adopted by the district court, but it may also occur if the district court based its decision on an error of law or fact. 285 Kan. at 384; *Consolver v. Hotze*, 306 Kan. 561, 569, 395 P.3d 405 (2017).

Furthermore, in termination of parental rights cases, K.S.A. 2017 Supp. 38-2267(a) states that "[a] continuance shall be granted only if the court finds it is in the best interests of the child." In ruling on a motion for continuance in such a case, our Supreme Court has stated that the district court must consider all of the circumstances, including "'the applicant's good faith, his showing of diligence, and the timetable of the lawsuit.' [Citation omitted.]" *In re J.A.H.*, 285 Kan. at 385. Here, K.J. argues that the district court did not make any of the findings necessary to deny her motion for a continuance.

12

In response, the State argues that under the language of the continuance statute, the district court only has to make a best interest determination if it grants the continuance. The statute specifically states that a continuance shall be granted only if the court finds it is in the best interests of the child. K.S.A. 2017 Supp. 38-2237(a). According to the State, the district court's refusal to grant the continuance was an implicit showing that the district court did not think the continuance was in the best interests of the child. Moreover, the State argues that the district court's exchange with K.J. before ruling on her request for a continuance demonstrates that the district court appropriately considered K.J.'s request.

We note that the State filed the motion to terminate K.J.'s parental rights on May 3, 2017. The district court originally set the termination hearing for July 12, 2017. However, it granted K.J.'s request for a continuance and rescheduled it for July 19, 2017. At the July 19, 2017 termination hearing, the district court explained that it had rescheduled the hearing due to "concerns raised as far as communication issues between the mother and her counsel . . . in order to give counsel some additional time to talk with her client." The district court then asked K.J.'s counsel whether she had an opportunity to talk to her client since the last hearing, and counsel stated that she had talked to her three times that week.

The district court explained that when it continued the previous hearing, it believed K.J. was going to get out of jail that week. Evidently, K.J. had thought her mother was going to post bond, but she was unable to do so. As such, K.J. was still in jail and had not been able to obtain proof that she had been attending the classes that RADAC recommended. The district court allowed K.J. to make a statement, and she asked the court for more time. Specifically, she stated that she had been slowly making progress and had gotten the drugs out of her system during her stay in jail.

13

K.J.'s counsel stated that once K.J. got out of jail, she would live with her mother. Also, K.J.'s counsel indicated that K.J.'s mother had gotten her a job at the company where she worked. Counsel argued that K.J. was now able to meet her case plan goals and, as such, was asking for 90 days. After considering the arguments, the district court found that although K.J. probably had good intentions, she had been unable to follow through in the past.

Moreover, the district court stated:

"THE COURT: I have to take into consideration not just what you're telling the Court but I also have to take into consideration what's in the best interest of the children. And it's not in the best interest of the children to keep having this go on and on and on. Especially when there's no proof that you're going to change.

"[K.J.:] I have proof and I can prove it to you. It's just I'm sorry I'm in here and I get out I can bring all my paperwork. I can bring everything to you.

"THE COURT: That's what today was for. That's why I continued from last week. I gave you a chance to get the stuff and bring it today.

"[K.J.:] I'm sorry. I thought my mom was going to bond me out and I guess she decided she wasn't.

"THE COURT: So we'll go forward with the hearing."

Based on our review of the record, we find that the district court sufficiently considered K.J.'s request. More importantly, the district court considered what was in the best interests of the children and concluded that "it's not in the best interest of the children to keep having this go on and on and on." Accordingly, we do not find that the district court abused its discretion in deciding not to grant another continuance of the termination hearing.

14

*Sufficiency of Evidence*

Next, K.J. contends that there was insufficient evidence to terminate her parental rights. The Kansas Legislature has specified that the State must prove "by clear and convincing evidence that the child is a child in need of care." K.S.A. 2017 Supp. 38-2250. The clear and convincing evidence standard of proof also applies to all termination of parental rights cases. K.S.A. 2017 Supp. 38-2269(a).

In reviewing a district court's decision to terminate a person's parental rights, we consider whether "a rational factfinder could have found it highly probable, *i.e.*, by clear and convincing evidence," that the parent's right should be terminated. *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008); *In re K.W.*, 45 Kan. App. 2d 353, 354, 246 P.3d 1021 (2011). In making this determination, we review all the evidence in the record in the light most favorable to the State. We are not to weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *In re B.D.-Y.*, 286 Kan. at 705.

The revised Kansas Code for the Care of Children provides that the district court may terminate parental rights when a child has been adjudicated a CINC. K.S.A. 2017 Supp. 38-2269(a). The statute lists nonexclusive factors the court shall consider in making a determination of unfitness. K.S.A. 2017 Supp. 38-2269(b). The district court must also consider a separate list of nonexclusive factors when a child is not in the parent's physical custody. K.S.A. 2017 Supp. 38-2269(c). Any one of the factors in K.S.A. 2017 Supp. 38-2269(b) or (c) may—but does not necessarily—establish grounds for termination of parental rights. K.S.A. 2017 Supp. 38-2269(f).

Here, a review of the record reveals that the district court cited the following facts as evidence that K.J. was unfit by reason of conduct or condition that rendered her unable to care properly for the children and that was unlikely to change in the foreseeable future:

15

"Mother not completed any case plan tasks, no proof of stable housing, failure to take drug tests, history of drug use and positive methamphetamine tests throughout the case, never provided proof of employment, failure of efforts by KVC to help mother complete any case plan tasks, no stable transportation, no proof of parenting classes or mental health compliance, lack of effort of mother to change circumstances, failure to maintain contact and visitation with children, mother's drug addiction makes her unable to care for children."

The district court determined that considering the physical, mental, or emotional health of the children, termination of parental rights was in the best interests of the children. The district court also determined that the children's physical, mental, and emotional needs would be best served by termination of K.J.'s parental rights.

We find that substantial competent evidence supports the district court's findings. The State provided evidence that K.J. had failed to complete any of her case plan tasks. Although K.J.'s mother alleged that K.J. had completed some tasks, K.J. provided no proof to support that allegation, and the district court did not find K.J.'s mother's testimony to be credible. Viewed in the light most favorable to the State, we conclude that a rational factfinder could have found clear and convincing evidence that K.J. was unfit and that her situation would not change in the foreseeable future. See *In re D.T.*, 30 Kan. App. 2d 1172, ¶ 4, 56 P.3d 840 (2002) (foreseeable future viewed in "child time," rather than "adult time").

*Placement with Maternal Grandmother*

Finally, K.J. contends that the district court erred in failing to consider the maternal grandmother as an option for placement of the children. The State argues that we do not have appellate jurisdiction to consider this argument because posttermination placement of the children is not an appealable order. As stated previously, the existence

16

of appellate jurisdiction is a question of law over which this court has unlimited review. *In re N.A.C.*, 299 Kan. at 1106.

Under the revised Kansas Code for the Care of Children, "[a]n appeal may be taken by any party or interested party from any order of temporary custody, adjudication, disposition, finding of unfitness or termination of parental rights." K.S.A. 38-2273(a). The Kansas Supreme Court has specifically determined that "the order terminating parental rights was the last appealable order under K.S.A. 2017 Supp. 38-2273(a)." *In re N.A.C.*, 299 Kan. at 1118. This court, therefore, lacks jurisdiction to consider this issue.

We note, however, that even if we did have jurisdiction over this issue that the record supports the district court's ruling regarding the placement of the children. The district court specifically noted that maternal grandmother had a child in need of care case against her, in which she was the alleged abuser of K.J. when she was a child. Likewise, the district court noted that maternal grandmother had a history of drug and alcohol problems. Thus, we do not find that the district court erred in deciding not to place the children with their maternal grandmother.

Affirmed.